NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals
# for the District of Columbia Circuit

### Nos. 22-5114 and 22-5135

MARIELLA CREAGHAN, Captain,

*Plaintiff-Appellant,*

*v.*

LLOYD J. AUSTIN, III, in his official capacity as the Secretary
of the United States Department of Defense; FRANK KENDALL, in his official
capacity as United States Secretary of the Air Force; STEPHEN N. WHITING,
LT. GEN., Individually and in his official capacity as Commander; ROBERT I.
MILLER, LT. GEN., Individually and in his official capacity
as a Surgeon General of the Air Force,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in
No.1:22-cv-00981-CKK, Honorable Colleen Kollar-Kotelly, U.S. District Judge*

## BRIEF FOR PLAINTIFF-APPELLANT

ERIN E. MERSINO
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
Tel.: (734) 837-2001
Fax: (734) 930-7160
emersino@thomasmore.org

*Counsel for Plaintiff-Appellant*

August 22, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 12 and  28(a)(1), Appellant Captain Mariella Creaghan hereby submits this certificate as to parties, rulings, and related cases.

**(A)   Parties**

Appellant

Appellant in this matter is Captain Mariella Creaghan.  She is a Captain in the United States Space Force.

Appellees

Appellees in this matter are Lloyd J. Austin III, United States Secretary of Defense; Frank Kendall, Secretary of the United States Air Force; Lt. Gen. Stephen N. Whiting, Commander in the United States Space Operations Command; and Lt. Gen. Robert I. Miller, Surgeon General of the United States Air Force.  The Appellees are sued in their official capacity.

No one participated as *amicus curiae* or intervened in the district court.

i

**(B)      Rulings under Review**

The ruling under review is the district court's Order Denying Appellant's Motion for a Preliminary Injunction and its Memorandum Opinion, issued on May 12, 2022, Dkt. Nos. 26, 27. Appellant seeks immediate review of the interlocutory order as of right pursuant to 28 U.S.C. 1292 (a)(1).

**(C)      Related Cases**

Appellant does not believe that this case meets the threshold of being a related case. Appellees filed a Notice of Related Case below. In the district court on April 19, 2022, Judge Timothy J. Kelly issued a minute order stating: "Civil cases in this district are related if, relevant here, they 'involve common issues of fact" or "grow out of the same event or transaction.' LCvR 40.5(a)(3). The party seeking related-case designation 'bears the burden of showing that the cases are related.' *Trump v. Comm. on Ways & Means*, 391 F. Supp. 3d 91, 95 (D.D.C. 2019). Defendants have filed a notice stating that this case is related to three other cases pending before another judge. *See* ECF No. 16. But their filing only contains only a single sentence stating that the other cases also involve 'service member

challenges to the Department of Defense COVID-19 vaccination requirement under the Religious Freedom Restoration Act and First Amendment to the Constitution.' *Id.* Accordingly, it is hereby ORDERED that, by April 22, 2022, Defendants shall file a further explanation as to why these cases are related. It is further ORDERED that Plaintiff shall file any response by April 29, 2022, and Defendants shall file any reply by May 3, 2022."

On April 25, 2022, however, the district court's Calendar Committee re-assigned the case to Judge Colleen Kollar-Kotelly. Dkt. No. 19. While the docket notice did not state which case/s were related, it appears it the lower court initially determined that *Navy Seal I v. Austin* was similar. 1:22-cv-688, 2022 WL 1294486 (D.D.C. Apr. 29, 2022). When rendering its opinion though, the district court noted that the instant case was "much closer," to presenting a violation of the Religious Freedom Restoration Act, 42 U.S.C. § 20000bb-1, *et seq.* (1993) deserving of injunctive relief.

Other pending cases which involve the implementation of the United States Department of Defense's vaccine mandate and the denial of religious accommodations to servicemembers, which again may not

met the threshold of designation as a related case, include *Knick v. Austin*, Case No. 22-cv-1267 (D.D.C.); *Navy SEALs #1-26 v. Biden*, Case Nos. 22-10077, 22-20534 (5th Cir.); *Poffenbarger v. Kendall*, Case No. 22-3413 (6th Cir.); *Doster v. Kendall*, Case No. 22-3497 (6th Cir.); *Roth v. Austin*, Case No. 22-2058 (8th Cir.); *Dunn v. Austin*, Case No. 22-15286 (9th Cir.); *Short v. Berger*, Case No. 22-15755 (9th Cir.); *Robert v. Austin*, Case No. 22-1032 (10th Cir.); *Air Force Officer v. Austin*, Case No. 22-11200 (11th Cir.); *Navy SEAL #1 v. Biden*, Case No. 22-10645 (11th Cir.).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES.................................................................................i

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 4

STATEMENT OF THE ISSUE .............................................................. 5

STATEMENT OF PERTINENT AUTHORITIES ................................. 6

STATEMENT OF THE CASE................................................................ 6

    A.    Procedural History.....................................................................7

    B.    Statement of Facts ..................................................... 9

SUMMARY OF THE ARGUMENT ..................................................... 19

STANDARD OF REVIEW..................................................................... 20

ARGUMENT ......................................................................................... 23

I.    The District Court Erred By Not Finding that
Captain Creaghan Met the Standard for Granting
an Injunction.....................................................................................23

    A.    The District Court Erred by Not Finding
    that Captain Creaghan is Likely to Succeed on the Merits
    of her RFRA Claim...............................................................23

    B.    The District Court Erred By Not Finding
    that Captain Creaghan Did Demonstrate a Likelihood
    of Success on her Free Exercise Claim.....................................44

    C.    The District Court Erred By Not Finding a Likelihood

of Success in Captain Creaghan's Equal Protection Claim………..49

D.     Without Injunctive Relief, Captain Creaghan Will
Undergo Irreparable Harm……......................................................51

E.     The Balance of Harm Tips in Favor of Granting
Captain Creaghan Injunctive Relief……........................................55

F.     Granting an Injunction to Protect Captain Creaghan's
Sincerely Held Religious Exercise Serves the Public Interest…...57

CONCLUSION........................................................................................ 59

CERTIFICATE OF COMPLIANCE....................................................... 60

CERTIFICATE OF SERVICE………………………………..…………61

# TABLE OF AUTHORITIES

Cases                                                              Page


*Air Force Officer v. Austin,*
2022 U.S. Dist. LEXIS 26660 (M.D. Ga. Feb. 15, 2022) ...................3, 52

*Bench Billboard Co. v. City of Cincinnati,*
675 F.3d 974 (6th Cir. 2012………………………………………………….50

*Bible Believers v. Wayne Cnty.,*
805 F.3d 228 (6th Cir. 2015)…………………………………………….…..47

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011)………………………………………………………...39

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014)……………….25, 26, 28, 30, 33, 37, 38, 39, 41, 42, 56

*Cantwell v. Conn.,*
310 U.S. 296 (1940)………………………………………………………….44

*Chappell v. Wallace,*
462 U.S. 296 (1983)………………………………………………….……..2

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)……………………………………… ……….38, 45, 47, 57

*City of Boerne v. Flores,*
521 U.S. 507 (1997)………………………………………………..……..3, 34

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985)………………………………………………..………49

*Davis v. D.C.,*
158 F.3d 1342 (D.C. Cir. 1998) ..........................................................53

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .............................................................. 20

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
70 F.3d 1474 (6th Cir. 1995) .................................................................57

*Doe v. Shanahan*,
755 F. App'x 19 (D.C. Cir. 2019)...........................................................1

*Doe v. Trump*,
275 F. Supp. 3d 167 (D.D.C. 2017) .........................................................1

*Dunn v. Blumstein*,
405 U.S. 330 (1972) ................................................................................ 42

*\*Elrod v. Burns,*
427 U.S. 347 (1976) ................................................................ .22, 52, 53

*Emp't Div. v. Smith*,
494 U.S. 872 (1990)......................................................21, 23, 24, 25

*Fisher v. Univ. of Tex.*,
570 U.S. 297 (2013) ................................................................................ 43

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) .............................................................. 54

*\*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021)........................................................... 34, 45, 46,

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
23 F.3d 1071 (6th Cir. 1994) ................................................... .........57

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006)...........................................................……33

*\*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)......................................20, 22, 53, 57

viii

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013)…………………………………………….....41

\*Holt v. Hobbs*,
574 U.S. 352 (2015)………………………………………………….25, 32, 33

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996)…………………………………………………55

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009)……………………………………………21

*Kikumura v. Hurley*,
242 F.3d 950 (10th Cir. 2001)……………………………………….55, 56

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013)………………………………..…...………38

*Marbury v. Madison*,
5 U.S. 137 (1803)……………………………………………………………2

*McDaniel v. Paty*,
435 U.S. 618 (1978)…………………………………………………44, 45

*McGowan v. Md.*,
366 U.S. 420 (1961)………………………………………………………50

*NLRB v. Canning*,
573 U.S. 513 (2014)…..……………………………………………………1

*Navajo Nation v. San Juan Cty.*,
929 F.3d 1270 (10th Cir. 2019)…..………………………………………23

\*Navy Seal 1 v. Austin*,
2022 U.S. Dist. LEXIS 31640 (M.D. Fla. Feb. 18, 2022)…..………..…52

*Newsome v. Norris*,
888 F.2d 371 (6th Cir. 1989)…..……………………………...…..…..…52

*Obama for Am. v. Husted,*
697 F.3d 423 (6th Cir. 2012)……………………………………………...21

*Oklevueha Native Am. Church of Haw., Inc. v. Holder,*
676 F.3d 829 (9th Cir. 2012)…………………………………………...59

*Priests for Life v. U.S. Dep't of Health and Human Servs.,*
772 F.3d 229 (2014)……………………………………………………...55, 57

*\*Pursuing Am.'s Greatness v. FEC,*
831 F.3d 500 (2016)……………………………………………………...21, 56

*Raymond v. Chi. Union Traction Co.,*
207 U.S. 20 (1907)………………………………………………………...50

*Redeemed Christian Church of God (Victory Temple) Bowie v. Prince
George's Cty.,*17 F.4th 497 (4th Cir. 2021)……….…………………......22

*Sherbert v. Verner,*
374 U.S. 398 (1963)…………………………………………...23, 24, 25, 42

*Singh v. Carter,*
168 F. Supp. 3d 216 (D.D.C. 2016)……………………………………...59

*Skinner v. Okla.,*
316 U.S. 535 (1942…………………………………………………………49

*Smith v. Univ. of Wash.,*
392 F.3d 367 (9th Cir. 2004)……………………………………………...23

*\*Tandon v. Newsom,*
141 S. Ct. 1294 (2021)…………………………………………………...3, 33

*\*Thomas v. Review Bd.,*
450 U.S. 707 (1981)……………………………………25, 26, 27, 28, 30, 33

*United States v. Lee*,
455 U.S. 252 (1982)...............................................................25, 27, 29, 30

*Weinberger v. Wiesenfeld*,
420 U.S. 636 (1975)................................................................................49

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008).............................................................................2, 20

*Wis. v. Yoder*,
406 U.S. 205 (1972)..........................................................................21,23, 37

## Constitutions

U.S. Const., art. I, § 8 ............................................................................. 2

## Statutes

28 U.S.C. § 1292 ..................................................................................... 5

28 U.S.C. § 1331 .....................................................................................4

*42 U.S.C. § 2000bb........................................................2, 3, 19, 21, 23, 24, 41

*42 U.S.C. § 2000cc.............................................................................2, 24, 25

## Other

DAF COVID-19 Statistics - Apr. 5, 2022, available at https://www.af.mil/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-5-2022/...............................................................14

Deirdre T. Little, et al., "COVID-19 Vaccination: Guidance for Ethical, Informed Consent in a National Context," 36 Issues L. & Med. 127 (2021), https://heinonline.org/HOL/PDFsearchable?handle=hein.journals/il med36&collection=journals§ion=14&id=&print=section§ioncount=1 &ext=.pdf&nocover=&display=0.........................................................10

S. Rep. No. 111, 1993 U.S.C.C.A.N......................................................... 27

Secretary of the Dep't of the  U.S.  Air  Force, https://static.epublishing.af.mil/production/1/af_hc/publication/dafi52-201/dafi52-201.pdf................................................................................ 16

Statement of Secretary John F. Kirby, https://www.defense.gov/News/Transcripts/Transcript/Article/2877275/ pentagon-press-secretary-john-kirby-holds-an-off-camera-press-briefing/.........................................................,.............................................14

Update: COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines,  https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/.........................................................,.....10

---

\* Authorities on which we chiefly rely are marked with asterisks.

## INTRODUCTION

The fundamental right to religious freedom as protected by the First Amendment and the Religious Freedom Restoration Act ("RFRA") requires proper interpretation by the judiciary.  The District Court in denying Captain Creaghan's motion for injunctive relief, abdicated its Article III responsibilities and in turn granted unfettered discretion to the Executive Branch.

This same District Court, remarkably, in *Doe v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017), *rev'd sub nom. Doe v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019), rejected the "military judgment" of the Commander-in-Chief and other military leaders and preliminarily enjoined the restriction on the service of transgendered individuals in the military even though the case raised no RFRA issues.  The message one may deduce from these incongruent rulings: Captain Creaghan's constitutional right to the free exercise of religion is undeserving of the District Court's review.  But if she were to assert a right to being transgendered, she would have her day in court.

At the end of the day, "it is the 'duty of the judicial department . . . to say what the law is.'"  *NLRB v. Canning*, 573 U.S. 513, 525 (2014) (quoting

1

*Marbury v. Madison*, 5 U.S. 137 (1803)). This case provides no exception. And "military interests do not always trump other considerations, and [the Supreme Court has] not held that they do." *Winter v. NRDC, Inc.*, 555 U.S. 7, 26 (2008); *see also Shanahan*, 755 F. App'x at 23 (suggesting that a "blanket ban" prohibiting the accession of transgender individuals into the military would be justiciable).

The U.S. Constitution grants authority to Congress to regulate the military. U.S. Const., art. I, § 8, cl. 14 ("To make Rules for the Government and Regulation of the land and naval Forces."); *see also Chappell v. Wallace*, 462 U.S. 296, 302 (1983) (acknowledging Congress' "plenary constitutional authority over the military").

Pursuant to its authority, Congress enacted RFRA (42 U.S.C. § 2000bb, *et seq*.) and made it expressly applicable to any "branch, department, agency, instrumentality, and official . . . of the United States," which unquestionably include military officials such as Defendants/Appellees ("Defendants"). 42 U.S.C. § 2000bb-2(1).

Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). RFRA protects "any exercise of religion." *Id*. at §§ 2000bb-2(4), 2000cc-5(7)(A). To justify a substantial

burden on the free exercise of religion under RFRA, the government must demonstrate that the challenged action "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at § 2000bb-1(b). In other words, the government must satisfy strict scrutiny.

As noted, there is no doubt that RFRA applies here. Accordingly, strict scrutiny applies to the challenge at issue. *Nothing less.* Congress provided no statutory exemption for the military, and it's not the role of this or any other court to create one.

Strict scrutiny is the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). "That standard 'is not watered down'; it 'really means what it says.'" *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (internal citation omitted). And while this "most demanding test" applies here, the District Court applied something much less in "deference" to the military. Such "deference" does violence to religious freedom. It "violates the very document [these government officials] swore to support and defend." *See Air Force Officer v. Austin*, No. 5:22-cv 00009-TES, 2022 U.S. Dist. LEXIS 26660, at *34-35 (M.D. Ga. Feb. 15, 2022).

Defendants do not challenge the fact that Appellant Captain

Creaghan's religious beliefs are sincerely held, nor do they challenge the fact that the vaccine mandate substantially burdens Appellant's religious exercise. Accordingly, the principal issue for this Court to resolve is whether Defendants can satisfy strict scrutiny under the facts of *this case* as they relate to *this plaintiff*. Defendants cannot meet their "most demanding" burden. As noted below, because this case involves the violation of the right to religious freedom, the likelihood of success factor in the preliminary injunction analysis is dispositive. In conclusion, Appellant satisfies the factors for granting a preliminary injunction. This Court should reverse the District Court and direct the entry of the requested injunction.

## JURISDICTIONAL STATEMENT

On April 9, 2022, Appellant Captain Creaghan filed her Verified Complaint challenging the military's denial of her religious exemption from its vaccine mandate on federal statutory and constitutional grounds. (JA 11, R-7 [Compl.]). The District Court has jurisdiction under 28 U.S.C. § 1331.

On April 15, 2022, Appellant Captain Creaghan filed a motion for a preliminary injunction. (R-11 [Mot. for Prelim. Inj.]). Defendants filed their opposition to the motion on April 29, 2022. (R-22 [Resp. to Mot. for Prelim.

4

Inj.]).

On May 12, 2022, the District Court issued an Order (JA 337, R-26 [Order]) and Memorandum Opinion (JA 338, R-27 [Mem. Op.]) denying the motion.

On May 18, 2022, Appellant Captain Creaghan timely filed a Notice of Interlocutory Appeal (JA 362; R-28 [Notice of Interlocutory Appeal]).

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the District Court erred when it denied Appellant Captain Creaghan's request for a preliminary injunction.

## STATEMENT OF PERTINENT AUTHORITIES

All relevant portions of any pertinent statute or regulation cited by Appellant are set forth in the body of this brief.

## STATEMENT OF THE CASE

If ever there was a case where a person deserves to be granted a religious exemption, this is this case. And if ever there was a case where the Defendants woefully failed to meet their burden under strict scrutiny, this is this case.

Appellant Captain Creaghan holds a non-deployable position and works at a desk where she does not engage in continuous close contact with

other service members or travel. (JA 11, R-7 [Compl.; JA 301-03, R-22 at Ex. 12 [Resp. to Mot. for Prelim. Inj.]). Her unit consists primarily of governmental contractors, who are not subject to Defendants' vaccine mandate. (JA 301-03, R-22 at Ex. 12 [Resp. to Mot. for Prelim. Inj.]; JA 324-34, R-23 at Ex. 1 [Decl. of Captain Mariella Creaghan]). After work hours, individuals in her unit are part of the regular, civilian world and free to engage with unvaccinated individuals as they please. (JA 324-34, R-23 at Ex. 1 [Decl. of Captain Mariella Creaghan]). And during work hours, Defendants allow visitors to enter Captain Creaghan's workspace without any vaccination requirement. (JA 11, R-7 at ¶¶ 88, 89 [Compl.]). She does not work with any high-risk individuals, and all other service members in her unit are vaccinated. (JA 301-03, R-22 at Ex. 12 [Resp. to Mot. for Prelim. Inj.]). Captain Creaghan's unit holds their meetings virtually and has no plans to change this practice. (JA 324-34, R-23 at Ex. 1 at ¶ 11 [Decl. of Captain Mariella Creaghan]).

Based on her individualized risk assessment, Captain Creaghan's Commander and her Delta Commander approved her request for a religious accommodation. (JA 301-03, R-22 at Ex. 12 [Resp. to Mot. for Prelim. Inj.]). The two commanders who know Captain Creaghan, her workplace facilities, and her job duties best both recommended approval of her

request.  (JA 301-03, R-22 at Ex. 12 [Resp. to Mot. for Prelim. Inj.]; JA 324-34, R-23 at Ex. 1 at ¶¶ 17-19 [Decl. of Captain Mariella Creaghan]).

By all accounts, an individualized exemption assessment required Defendants to grant Captain Creaghan a religious exemption—her Commanders agreed.  But Defendants yielded to a blanket, one size fits all approach to their mandate, leading to the wrongful denial of Captain Creaghan's religious exemption request.  That approach fails strict scrutiny and necessitates reversal of the lower court's decision.

## A.    Procedural History

On April 9, 2022, Appellant Captain Creaghan filed her Verified Complaint challenging the military's denial of her religious exemption from its vaccine mandate on federal statutory and constitutional grounds (First and Fifth Amendments).. (JA 11, R-7 [Compl.]).  After being informed that Defendants intended to issue a Letter of Reprimand and punish Captain Creaghan for her sincerely held religious beliefs, Captain Creaghan, filed a motion for preliminary injunction.  (R-11 [Mot. for Prelim. Inj.]).

Captain Creaghan requested that the District Court enjoin the Defendants from "enforcing against Plaintiff any order or regulation that requires her to receive a COVID-19 vaccination that violates her sincerely held religious beliefs as described in Appellant's Verified Complaint" and

7

enjoin Defendants from "punishing, prosecuting, or taking any adverse or retaliatory action against Appellant as a result of, arising from, or in conjunction with Appellant's request for a religious accommodation or Defendants' denial of Appellant's religious accommodation." (*Id.* at [Proposed Order]).  Defendants opposed the motion.  (R-22 [Resp. to Mot. for Prelim. Inj.]).

On May 12, 2022, the District Court issued an Order (JA 337, R-26 [Order]) and Memorandum Opinion (JA 338, R-27 [Mem. Op.]) denying the motion.  In its opinion, the District Court found:

> Captain Creaghan's [11] Motion seeks preliminary relief from this Court barring Defendants from "punishing, prosecuting, or taking any adverse or retaliatory action against Plaintiff as a result of, arising from, or in conjunction with Plaintiff's request for a religious accommodation or Defendants' denial of Plaintiff's religious accommodation." As the Court explained in a similar case, requests for religious exemptions from military-mandated medical requirements "raise particularly difficult questions that implicate a storm of colliding constitutional interests." Navy SEAL v. Austin, 2022 WL 1294486, at *1 (D.D.C. Apr. 29, 2022). Although this case is much closer than Navy SEAL, the Court remains concerned that it lacks the competence to "evaluate the merits of military [epidemiological and tactical] expertise" or to "weigh technical issues of public health and immunology" necessary to resolve the case. *Id.* at *5.

(JA 338, R-27, [Mem. Op. at 1]).  The District Court then, seemingly in error, stated it relied on the filings in Navy SEAL as the factual basis for its opinion.  (JA 339, R-27, [Mem. Op. at 2, fn. 1]).  Captain Creaghan timely appealed to this Court.

8

### B.    Statement of Facts

Captain Creaghan is a devout Roman Catholic who dutifully and strictly tries to follow the teachings of the Catechism of the Catholic Church. (JA 16-17, R-7, [Compl. at ¶¶ 27-28]). Captain Creaghan sincerely believes that it is sinful to cooperate in an abortion, even in a remote material way. (JA 17, R-7, [Compl. at ¶ 29-30]). Upon deep reflection and discernment, she has concluded that her religious convictions forbid her from supporting, participating in, or benefiting from abortion, including benefitting from the byproduct of abortion: a deceased human and his or her tissue or cell line. (JA 17, R-7, [Compl. at ¶ 29-32]).

All available COVID-19 vaccines were created with the use of aborted fetal cell lines. (JA 17-19, R-7, [Compl. at ¶ 35, fns. 5 & 6]). The Johnson & Johnson vaccine uses the PerC6 aborted fetal cell line in development. *Id.* PerC6 cells were derived from an 18-week-old fetus who was electively aborted. *Id.* The cells used to procure the Johnson & Johnson vaccine distinctly involve elective abortion and the use of human tissue and cell lines. *Id.* Appellant's faith instructs that it is profoundly unethical to do so. *Id.* Unfortunately, the Moderna and Pfizer vaccinations suffer from the same flaw. *Id.*

The Moderna and Pfizer use the HEK293 aborted cell line in the

9

confirmation phase, a cell line derived from elective abortion as well.   *Id.*

Captain Creaghan holds sincere religious objections to the COVID-19

vaccines that Defendants have ordered her to receive.  *Id.*[1]

On August 24, 2021, Defendant Austin issued a memorandum titled

"Mandatory Coronavirus Disease 2019 Vaccination of Department of

Defense Service Members" (referred to as the "vaccine mandate").   (JA 22,

R-7, [Compl. at ¶ 48]).   The vaccine mandate directs the DoD to vaccinate

all active duty and reserve service members against COVID-19.  *Id.* The

vaccine mandate states that service members who previously contracted

COVID-19, and now have active antibodies against the virus, like

Appellant, are not considered fully vaccinated and are still required to

receive a vaccination against COVID-19.  *Id.* The vaccine mandate requires

service members to undergo one of the three COVID-19 immunizations to

which Appellant holds sincere religious objections.  (JA 22, R-7, [Compl. at

---

[1] Novavax also suffers from similar flaws and conflicts with Captain Creaghan's sincerely held religious beliefs. *See, e.g.*, Prentice, David, Ph.D., "Update: COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines" available at https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/; Deirdre T. Little, et al., "COVID-19 Vaccination: Guidance for Ethical, Informed Consent in a National Context," 36 *Issues L. & Med. 127, 151* (2021), *available at* https://heinonline.org/HOL/PDFsearchable?handle=hein.journals/ilme d36&collection=journals§ion=14&id=&print=section§ioncount=1&ext=.p df&nocover=&display=0.

¶ 49]).

Defendants issued guidance stating that service members who do not receive these immunizations by the established deadlines will immediately suffer adverse consequences, including court-martial (criminal) prosecution, involuntary separation, relief for cause from leadership positions, removal from promotion lists, inability to attend certain military training and education schools, loss of special pay, placement in a non-deployable status, recoupment of money spent training the service member, and loss of leave and travel privileges for both official and unofficial purposes. (JA 23, R-7, [Compl. at ¶ 51]).

On September 3, 2021, Secretary Kendall issued a Memorandum for Department of Air Force Commanders, with the subject: Mandatory Coronavirus Disease 2019 Vaccination of Department of the Air Force Military Members ("Air Force Vaccine Mandate").[2]  (JA 23, R-7, [Compl. at ¶ 52]).    Then on September 13, 2021, Maj. Gen. Donna D. Shipton issued a memorandum ordering the Department of the Air Force

_____

[2] Secretary Kendall's September 3, 2021 Memorandum is *available at* https://www.hqrio.afrc.af.mil/Portals/149/Documents/COVID/20210903%2 0DAF_%20SecAF%20Memo%20%20Mandatory%20Coronavirus%20Disea se%202019%20Vaccination%20of%20Department%20of%20the%20Air%2 0Force%20Military%20Members.pdf?ver=YogX1KMirgEUGIvzJtgUSw%3 D%3D.

personnel assigned to the National Reconnaissance Office (NRO) to undergo COVID-19 vaccination, stating that "[m]andatory vaccination will only include COVID-19 vaccines that receive full licensure from the Food and Drug Administration." (JA 23, R-7, [Compl. at ¶ 53 & Ex. 1]).

On October 18, 2021, Lt. Gen. Robert I. Miller issued a memorandum with the subject: COVID-19 Immunization Religious Accommodation Request Appeals. (JA 24, R-7, [Compl. at ¶¶ 55 & Ex. 1]). The memorandum states that Airmen who believe the vaccine mandate "substantially burdens their exercise of a sincerely held belief may request exemption from this immunization requirement." *Id.* The memorandum provides that "[r]equests for religious accommodation from the requirement will follow guidance in DAFI 52-201, *Religious Freedom in the Department of the Air Force*, dated June 23, 2021." *Id.* However, on November 2, 2021, Lt. Gen. Robert I. Miller took to Twitter to further propagate that the "entire" military undergo COVID-19 vaccination. Defendant Miller likened COVID-19 vaccination to "wearing a helmet."[3] (JA 24, R-7, [Compl. at ¶¶ 56]).

---

[2]Defendant Miller's Tweet is *available at* https://twitter.com/usairforce/status/1455500274232176641.

On December 7, 2021, Defendant Kendall issued a memorandum with the subject: Supplemental Coronavirus Disease 2019 Vaccination Policy.[3] The memorandum stated that if a final appeal is denied, the "service member will have five (5) calendar days from the notice of denial to begin the COVID-19 vaccination regimen." The memorandum stated that "[s]ervice members separated due to refusal of the COVID-19 vaccine will not be eligible for involuntary separation pay and will be subject to recoupment of any unearned special or incentive pays."

Defendant Kendall's December 7, 2021, Supplemental Memorandum, outlined three bases for exemptions to the COVID-19 vaccination: medical, religious, and administrative. *Id.* The memorandum also emphasized that service members with pending requests for accommodations, such as Appellant, were temporarily exempt from complying with the mandate. *Id.* The memorandum forwarded the blanket statement that undergoing COVID-19 vaccination was an "essential military readiness requirement for all components of the Air Force and Space Force"— revealing that while a process was

---

[3]Defendant Kendall's Supplemental Memorandum is *available at* https://www.af.mil/Portals/1/documents/2021SAF/12_Dec/Supplemental_ Coronavirus_Disease_ 2019_Vaccination_Policy.pdf.

provided for service members, the Defendants had already determined the outcome. *Id.* No accommodations would be properly considered under RFRA, and no accommodations would be forthcoming.

To date, more than 98% of active service members in the United States Air Force have undergone COVID-19 vaccination. DAF COVID-19 Statistics - Apr. 5, 2022, available at https://www.af.mil/News/Article-Display/Article/2989918/daf-covid-19-statistics-apr-5-2022/.

However, Pentagon Press Secretary John F. Kirby, when speaking on behalf of Secretary of Defense Lloyd J. Austin, in remarks on December 16, 2021, stated "…what we want is 100 percent vaccination." [4] Therefore, it was not surprising that on February 11, 2022, Lt. Gen. Stephen N. Whiting denied Appellant's Request for a Religious Accommodation. (R-7, [Compl. at Ex. 3]).

In the denial, Defendant Whiting does not challenge that Captain Creaghan's religious beliefs are sincere (indeed they are). *Id.* Instead, Defendant Whiting without considering any lesser restrictive alternatives to the vaccine mandate, issues a conclusory and boilerplate

---

[4] Statement of Secretary John F. Kirby is *available at* https://www.defense.gov/News/Transcripts/Transcript/Article/2877275/pentagon-press-  secretary-john-kirby-holds-an-off-camera-press-briefing/.

statement that "less restrictive means would not be sufficient to achieve the compelling governmental interest in our vaccination against COVID-19." *Id*. Defendant Whiting fails to explain why testing and screening protocol would not be a lesser restrictive alternative. *Id*.

On February 25, 2022, Appellant filed her formal appeal. (R-7, [Compl. at Ex. 4]). On March 25, 2021, Lt. Gen. Robert I. Miller denied Appellant's appeal, making the final decision regarding Appellant's request for a religious accommodation. (R-7, [Compl. at Ex. 5]). Again, the denial contains boilerplate language and does not explain why lesser restrictive alternatives could not be used. *Id*. Defendants then waited another eleven days, during which time Appellant remained exempt from their mandate, and informed Appellant of their denial of her appeal on April 5, 2022. (R-7, [Compl. at Ex. 3]).

Upon information and belief, the Air Force had received an estimated 12,623 requests for religious exemptions from the vaccine mandate. (JA 27, R-7, [Compl. at ¶ 72]). The Air Force had approved only five of those requests and only one appeal. *Id*. Meanwhile, the Air Force has granted 1,513 temporary medical exemptions and 2,314 administrative exemptions. *Id*. Upon information and belief, while the

United State Space Force has issued temporary exemptions, such as the one extended to Appellant during the pendency of her request, it has approved *zero* requests for accommodations due to religious purposes. (JA 27, R-7, [Compl. at ¶ 72]).

Since November 2, 2021, Appellant has worked under a temporary exemption from the military's vaccine mandate. *See* Secretary of the Dep't of the U.S. Air Force, DAFI52-201 23 June 2021, https://static.e-publishing.af.mil/production/1/af_hc/publication/dafi52-201/dafi52-201.pdf (granting a temporary exemption for administrative convenience while processing exemption requests). (JA 12, R-7, [Compl. at ¶ 2). The temporary exemption required Appellant to submit to lesser restrictive alternatives such as COVID-19 screening, testing, and other measures aimed to mitigate transmission of the virus. (JA 12, R-7, [Compl. at ¶ 3). Appellant has followed these measures without issue. *Id.*

Since Defendants' implementation of their mandate, the COVID-19 case count and number of hospitalizations due to COVID-19 has plummeted, and the area where Appellant is based is now considered to be at a "low" community level per the Centers for Disease Control and

16

Prevention (hereinafter CDC) guidelines. CDC's COVID Data Tracker, Integrated County View, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=Virginia&data-type=&list_select_county=51059. (JA 12, R-7, [Compl. at ¶¶ 2, 84 and Ex. 7]). New hospitalizations are now at 1 per population of 100,000. (JA 12, R-7, [Compl. at ¶ 4]).

Defendants allowed lesser restrictive alternatives to their mandate for several months during Appellant's temporary exemption. However, on March 25, 2022 Defendants decided to deny Appellant's request for a religious accommodation to the mandate and require that she obtain immunizations in direct opposition to her sincerely held religious beliefs. *See* (R-7, [Compl. at Exs. 5, 6]). Eleven days later on April 5, 2022, Defendants decided to inform Appellant of their decision. (R-7, [Compl. at Ex. 6]). Defendants gave Appellant five days to undergo vaccine or leave the military. That timeline passed, but Defendants agreed to extend the deadline to May 13, 2022. (JA 6-7).

Appellant is now subject to punishment, prosecution under the UCMJ, pay recoupment for her present active service commitments, and face involuntary separation from the military. Appellant's commander counseled her on April 5, 2022 that if she did not complete the first dose of

17

the required COVID-19 vaccines, "initiation of administrative discharge steps will be pursued according to the UCMJ." ((R-7, [Compl. at Ex. 6]).

Defendants carried out their promise to issue Appellant a Letter of Reprimand (LOR) for Failing to Obey a Lawful Order per Article 92 of the UCMJ on July 5, 2022. *Id*. For officers, a LOR immediately establishes an Unfavorable Information File (UIF) per AFI 36-2907, which permanently mars Appellant's record and affects her Officer Performance Report (OPR) which has been due to close out on May 31, 2022 and is still pending. *See* https://static.e-publishing.af.mil/production/1/af_a1/publication/afi36-2907/afi36-2907.pdf; (JA 335036, R-23 at Ex. 2 [Decl. of Marcus Williams]).

Defendants' decision to rescind Appellant's temporary exemption and refusal to accommodate her sincerely held religious beliefs—after the threat of the COVID-19 peaked, after the efficacy of the presently available vaccines have waned with new COVID-19 variants, and after the virus is becoming endemic—conflicts with both the Defendants' requirement to follow the RFRA and to employ the least restrictive means.

Defendants have now forced Appellant to either 1) get the COVID-19 immunizations knowing that doing so violates her sincerely held religious beliefs, 2) apply to leave the military—losing her livelihood and incurring substantial financial harm that will require paying back the military for graduate school, or 3) undergo further punishment under the UCMJ and the permanent ruin of her military record. And given that Appellant is presently fulfilling multiple active service commitments, the second option is not guaranteed and, in fact, is unlikely.

## SUMMARY OF THE ARGUMENT

A preliminary injunction is appropriate in this case because (1) Appellant can demonstrate a substantial likelihood of success on the merits of his claims arising under RFRA (42 U.S.C. § 2000bb, *et seq*.), the Free Exercise Clause of the First Amendment, and the equal protection guarantee of the Fifth Amendment; (2) the momentary loss of religious freedom constitutes irreparable harm as a matter of law; (3) the balance of equities favors protecting religious freedom; and (4) it is always in the public interest to uphold fundamental rights.

The resolution of this appeal turns on whether the District Court appropriately applied strict scrutiny. It did not. As argued here, upon

this Court's *de novo* review of the lower court's application of this most demanding test known to constitutional law, the Court should reverse the District Court and remand for entry of the requested injunction.

## STANDARD OF REVIEW

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.' 632 F.3d at 724 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). We review the 'district court's weighing of the four preliminary injunction factors and its ultimate decision to issue or deny such relief for abuse of discretion.' *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). We review the district court's legal conclusions *de novo* and its findings of fact for clear error." *Gordon v. Holder*, 721 F.3d 638, 643-44 (D.C. Cir. 2013).

Furthermore, "[i]n First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir.

2016) (internal quotations and citation omitted); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'") (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). This principle of law also applies to Appellant's RFRA claim as Congress, through RFRA, intended to bring Free Exercise Clause jurisprudence back to the test established prior to *Employment Division v. Smith*, 494 U.S. 872 (1990). *See, e.g.,* 42 U.S.C. § 2000bb (enacting RFRA "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases *where free exercise of religion is substantially burdened*") (emphasis added).  In other words, RFRA expressly protects the fundamental right to religious freedom guaranteed by the First Amendment as a matter of federal statutory law.

The reason why likelihood of success is the most important factor is because "[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added); *see also Gordon*, 721

21

F.3d at 653 (stating that "[a]lthough a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes") (internal citation and quotations omitted). And the "enforcement of an unconstitutional law is *always* contrary to the public interest." *Id.* at 653 (emphasis added). There isn't a "military deference" exception, and this Court should not create one. Thus, once a likelihood of success is established in cases involving First Amendment freedoms, such as this one, it follows that the remainder of the preliminary injunction factors favor granting the injunction.

Moreover, whether Appellant is likely to succeed on the merits of her claims turns on whether the District Court properly applied the strict scrutiny standard, and the lower court's application of strict scrutiny is reviewed *de novo. Redeemed Christian Church of God (Victory Temple) Bowie v. Prince George's Cty.*, 17 F.4th 497, 506 (4th Cir. 2021) (reviewing the district court's strict scrutiny application *de novo*); *Smith v. Univ. of Wash.*, 392 F.3d 367, 371 (9th Cir. 2004) ("A district court's conclusions regarding the sufficiency of the facts in meeting strict scrutiny are reviewed *de novo.*"); *Navajo Nation v. San Juan Cty.*, 929 F.3d 1270,

1288 (10th Cir. 2019) ("We review the application of strict scrutiny *de novo*.").

## ARGUMENT

**I. The District Court Erred By Not Finding that Captain Creaghan Met the Standard for Granting an Injunction.**

**A.    The District Court Erred by Not Finding that Captain Creaghan is Likely to Succeed on the Merits of her RFRA Claim**

Congress, through RFRA, intended to bring Free Exercise Clause jurisprudence back to the test established prior to *Employment Division v. Smith*, 494 U.S. 872 (1990).  *See, e.g.,* 42 U.S.C. § 2000bb (enacting RFRA "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened").  RFRA, which applies to any "branch, department, agency, instrumentality, and official . . . of the United States," plainly applies to Defendants. 42 U.S.C. § 2000bb-2(1).

Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).  RFRA protects "any exercise of religion." *Id*. at §§ 2000bb-2(4), 2000cc-5(7)(A).  To justify a

substantial burden on the free exercise of religion under RFRA, the government must demonstrate that the challenged action is "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at § 2000bb-1(b). The government's burden is a heavy one.

RFRA protects "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000bb-2(4) (emphasis added). An "exercise of religion," in turn, is any "religiously motivated conduct," which includes the "performance of (or abstention from) physical acts . . . for religious reasons." *Employment Div. v. Smith*, 494 U.S. at 875, 877. This understanding of religious exercise has been established for at least the past fifty years. *See Sherbert*, 374 U.S. at 403 (describing religious exercise as "conduct prompted by religious principles"). And if there was any doubt about its scope, Congress explicitly stated that the "concept" of religious exercise must "'be construed in favor of a broad protection of religious exercise.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-3(g)).

24

The Supreme Court has likewise recognized that religious exercise can take a variety of forms. In *Smith*, for example, the plaintiffs exercised their religion by ingesting hallucinogenic drugs. 494 U.S. at 874. In *Sherbert*, the plaintiff exercised her religion by refusing to work on a particular day of the week. 374 U.S. at 399-400. In *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), the plaintiffs exercised their religion by engaging in animal sacrifice. *Id.* at 524-25. And in *Holt v. Hobbs*, 574 U.S. 352 (2015), "the religious exercise at issue [wa]s the growing of a beard" and the refusal to shave it. *Id.* at 361.

Supreme Court cases also make clear that religious exercise can involve indirect actions. In *Thomas v. Review Board*, 450 U.S. 707, 715 (1981), the plaintiff exercised his religion by refusing to "participat[e] in the production of armaments" that might be used by others in war. In *United States v. Lee*, 455 U.S. 252, 257 (1982), the plaintiffs exercised their religion by refusing to "pay[] Social Security taxes" that they believed would "threaten" the social practice among the Amish of caring for each other without governmental assistance. In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 179 (2012), the plaintiff was a school that exercised its religion by refusing to

employ a teacher who had acted contrary to the tenets of its Lutheran "belief[s]." And in *Hobby Lobby*, the plaintiffs exercised their religion by refusing to provide their employees with health insurance that, if used by employees, might "result in the destruction of an embryo." 573 U.S. at 720.

Supreme Court cases have thus firmly established that all religious exercise must be treated equally. The law cannot treat some instances of religious exercise as more important, significant, or substantial than others, because "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Smith*, 494 U.S. at 887. Simply put, "the judicial process is singularly ill equipped to resolve" how important or substantial a religious practice is. *Thomas*, 450 U.S. at 715-16. Such matters are "not within the judicial function [or] judicial competence," because "[c]ourts are not arbiters of scriptural interpretation." *Id.* at 716. Accordingly, once a plaintiff draws a line between conduct that is "consistent with his religious beliefs" and conduct that is "morally objectionable," "it is not for [a court] to say that [his] religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725.

Of course, courts can assess whether a person's asserted religious belief is "sincere" in order to "weed out insincere claims" that are simply a pretext to avoid complying with the law. *Hobby Lobby*, 573 U.S. at 717 n.28. As RFRA's legislative history explains, courts must be vigilant against "false religious claims that are actually attempts to gain special privileges." S. Rep. No. 111, 1993 U.S.C.C.A.N. at 1900. If a claim is "nonreligious in motivation," then it is not entitled to any protection. *Thomas*, 450 U.S. at 715. But where, as here, a claimant's sincerity is undisputed, courts must "accept" the claimant's view that a particular act or omission is "forbidden by [his] faith." *Lee*, 455 U.S. at 257.

It is equally clear that courts cannot second-guess religious objections that are based on a theory of moral complicity. If a religious adherent sincerely believes that she must abstain from a particular activity because it would make her morally complicit in a sinful act, then courts must defer to her sincerely held belief. The reason is straightforward: whether an act "is connected" to wrongdoing "in a way that is sufficient to make it immoral" is fundamentally a question of private religious belief. *Hobby Lobby*, 573 U.S. at 724.

27

This question "implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that" the person believes "has the effect of enabling or facilitating the commission of an immoral act by another." *Id*. Courts cannot "[a]rrogat[e] the authority to provide a binding national answer to this religious and philosophical question." *Id*. This follows directly from the principle that secular courts have no business questioning whether a religious believer has "correctly perceived the commands of [his own] faith." *Thomas*, 450 U.S. at 716.

At least three Supreme Court cases directly confirm that courts may not second-guess a plaintiff's sincere, complicity-based religious objection. In *Thomas*, the plaintiff had a religious objection to "participat[ing] in the production of armaments" that might be used by others in war. 450 U.S. at 715. Specifically, he objected to working directly on "tank turrets," even though he did not object to working in a "roll foundry" on "sheet steel" that "may have found its way into tanks or other weapons." *Id*. at 711 & n.3. The lower court dismissed his claim because it found his beliefs to be logically "inconsistent." *Id*. at 715. The

Supreme Court rejected that reasoning, emphasizing that the plaintiff was entitled to decide for himself which actions were "sufficiently insulated from producing weapons of war." *Id.* Once he "drew a line" as to which conduct he found religiously objectionable, a court could not "undertake to dissect [his] religious beliefs." *Id.* Because he had an "honest conviction that [certain] work was forbidden by his religion," his refusal to engage in such work was a protected exercise of religion. *Id.* at 716.

Similarly, in *Lee*, the Amish plaintiff objected to paying Social Security taxes because he believed that doing so would discourage other Amish from "provid[ing] for their fellow members the kind of assistance contemplated by the social security system." 455 U.S. 257. The Government disagreed, arguing that "payment of social security taxes w[ould] not," in fact, "threaten the integrity of the Amish religious belief or observance." *Id.* Once again, the Supreme Court rejected that argument, stating that "[i]t is not within the judicial function [or] competence . . . to determine whether [the plaintiff] or the Government has the proper interpretation of the Amish faith" as to whether paying Social Security taxes was religiously objectionable. *Id.* (citation and

internal quotation marks omitted). Because the plaintiff *himself* believed that paying the taxes was religiously forbidden, his refusal to do so was an exercise of religion, and "compulsory participation in the social security system interfere[d] with [his] free exercise rights." *Id.*

Finally, in *Hobby Lobby*, the government's main argument was that "the connection between what the objecting parties must do (provide [contraceptive coverage]) and the end that they find to be morally wrong (destruction of an embryo) is simply too attenuated" to support a cognizable religious objection. 573 U.S. at 723-24. The Supreme Court rejected that argument, noting that it "dodge[d] the question that RFRA presents" and instead sought to address a "question that the federal courts have no business addressing," namely, "whether the religious belief asserted in a RFRA case is reasonable." *Id.* at 724. Just as in *Thomas* and *Lee*, the relevant point was that the plaintiffs *themselves* believed that providing the mandated coverage would wrongfully "facilitat[e] the commission of an immoral act by another." *See id.* at 724-25. For that reason, their refusal to provide that coverage was a protected exercise of religion.

As the record in the lower reflects, Defendants found Appellant's request for a religious exemption (a review mandated by the process put in place by Defendants) to be sincere: "[i]t is her sincere expression of religious beliefs and her personal religious conviction that any vaccines that utilized aborted fetal cells in production or texting violates her beliefs.  She cannot, in good conscience, willingly participate or benefit from abortion.  Capt Creaghan consistently keeps the tenets and practices of her religious beliefs . . . Her daily beliefs are consistent with [sic] her years of service to the USAF and demonstrate her convictions for an exemption." (JA 275, R-22 at Ex. 12, [Memo. of Robert D. Mohr, Ch. Capt.]).  Chaplain Mohr also "recommend[ed] the approval of an exemption as [Appellant's] request is based on sincerely held religious belief."  *Id*.  Indeed the lower court record reveals that the Defendants do not doubt that Appellant holds a sincerely held religious belief.  Appellant's religious exercise in this case is clearly established, and the sincerity of her religious beliefs that form the bases for her religious exercise is not disputed.  We turn now to the substantial-burden analysis.

The Supreme Court's substantial-burden analysis involves a straightforward, two-part inquiry: a court must (1) identify the religious

exercise at issue, and (2) determine whether the government has placed substantial pressure—*i.e.*, a substantial burden—on the plaintiff to abandon that exercise. *See, e.g.*, *Holt*, 574 U.S. at 360-61 (stating that the plaintiff "bore the initial burden" of (1) showing that the government policy at issue "implicates his religious exercise," and (2) showing that the "policy substantially burdened that exercise of religion").

As set forth above, Appellant has identified the religious exercise at issue by showing that the challenged mandate implicates her religious exercise. Appellant has also shown that the challenged mandate has placed substantial pressure—a substantial burden—on her to abandon that exercise. Here, by failing to comply with the vaccine mandate, Appellant is suffering and will continue to suffer adverse and harsh consequences, including, but not limited to, prosecution and criminal penalties, adverse disciplinary proceedings, letter of reprimand, negative performance reviews, damage to her reputation, discharge from the military, an adverse fitness report, loss of pay and benefits, loss of education and training opportunities, recoupment, and other punitive measures.

Each of these adverse consequences or penalties imposes a substantial burden on Captain Creaghan's religious exercise. As the Supreme Court makes clear, the simple denial of unemployment benefits (*Thomas,* 450 U.S. at 717-18), the *threat* of "disciplinary action" (*Holt*, 574 U.S. at 358), and adverse economic incentives (*Hobby Lobby*, 573 U.S. at 722) all are sufficient for the Court to find a substantial burden. Appellant, therefore, has demonstrated that Defendants' vaccine mandate substantially burdens her religious exercise. Defendants do not appear to dispute this. Lieutenant Colonel McCafferty explicitly informed them that the Appellant "has a sincerely held religious belief. The COVID-19 vaccine constitutes a substantial burden upon this religious belief." (JA 312, R-22 at Ex. 12).

As the vaccine mandate substantially burdens Appellant's exercise of religion, the "*burden is placed squarely on the Government*" to show that its mandate satisfies strict scrutiny. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006) (emphasis added). As the District Court tacitly (and perhaps unwittingly) acknowledged, Defendants face apparent challenges to meet this demanding standard here. (*See, e.g.,* JA 353-54, R-27, [Mem. Op. at 16-17] (admitting the

court's prior decision regarding Defendants' vaccine mandate was based on "a dearth of authority and a relatively undeveloped record" and describing its conclusion as "very tentative" and then finding that Appellant "makes a much stronger showing of likelihood of success on the merits on her RFRA claim than the plaintiff" in the previous case.)).

Strict scrutiny is the "most demanding test known to constitutional law." *City of Boerne*, 521 U.S. at 534. It "requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.' . . . That standard 'is not watered down'; it 'really means what it says.'" *Tandon*, 141 S. Ct. at 1297 (internal citation omitted).

Under strict scrutiny, "so long as the government can achieve its interests in a manner that does not burden religion, it *must* do so." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (emphasis added). In *Fulton*, the Court held that Philadelphia's refusal to contract with Catholic Social Services for the provision of foster care services unless CSS agrees to certify same-sex couples as

foster parents violated the Free Exercise Clause of the First Amendment. The Court affirmed that "[a] government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is

34

narrowly tailored to achieve those interests. . . ." *Id.* at 1881 (internal citation omitted). The Court clarified that "[t]he question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies *generally*, *but whether it has such an interest in denying an exception to CSS.*" *Id.* (emphasis added). Consequently, the question is not whether the government has a compelling interest in enforcing its vaccine mandate *generally*, *but whether it has such an interest in denying an exception to Captain Creaghan.*

Per the Supreme Court, "It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye*, 508 U.S. at 547 (internal quotations and citation omitted). Here, Defendants permit medical and administrative exemptions, and in theory religious exemptions for other service members. Yet, those who are <u>*not*</u> vaccinated because they have a medical (or administrative) exemption pose the same alleged risks as those who are not vaccinated because they object to the mandate on religious grounds. This disparity in treatment not only demonstrates overt discrimination against certain

religious observers, such as Appellant, it demonstrates that Defendants' alleged interests are not compelling. Reaching this legal conclusion does not require any court to make medical or scientific factual determinations, or tactical decisions as the District Court suggested. It only asks the court to make a legal determination.

The sole question under RFRA is whether anything less than denying all accommodations and punishing Captain Creaghan is necessary to achieve Defendants' compelling interest. The answer is no. Defendants' interest cannot be compelling here because it "leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi*, 508 U.S. at 547. Defendants have the burden, not of proving it "has a compelling interest in enforcing its [vaccine] policies generally, but whether it has such an interest in denying an exception to" Captain Creaghan. *Fulton*, 141 S.Ct. at 1881.

It is hard to see Defendants' interest is particular to Captain Creaghan when their stated basis for denying a religious accommodation hinges on deployment, travel, and being in close contact— none of which Captain Creaghan does now or will do in her current career path. Defendants have not found it compelling for Captain Creaghan to be

36

vaccinated up to this point, and there is not an emergency now or change in her position to justify this need now, when they granted a temporary administrative exemption from November of 2021 to mid-May of 2022. Defendants choose not to extend its mandate to contractors who work in the same space, on the same matters. Defendants do not prohibit contact outside of work.[5]

Under RFRA, Defendants must "demonstrate that the compelling interest test is satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 573 U.S. at 726-27 (citation omitted). "[B]roadly formulated" or "sweeping" interests are inadequate. *O Centro*, 546 U.S. at 431; *Yoder*, 406 U.S. at 221. Rather, Defendants must show with "particularity how [even] admittedly strong interest[s]" "would be adversely affected by granting an exemption." *Yoder*, 406 U.S. at 236. In other words, a court must "look to the marginal interest in

---

[5] It should be noted that Defendants' vaccine mandate does not require that service members be "up to date" pursuant to CDC guidelines. Therefore, in many instances, their mandate has no effect on quarantining regulations. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stayup-to-date.html. And both vaccinated and unvaccinated service members are capable of transmitting COVID-19. CDC, *Omicron Variant: What You Need to Know*, https://tinyurl.com/44udfzw5 ("[A]nyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others."); *see also BST Holdings, LLC* v. *OSHA*, 17 F.4th 604, 616 n.19 (5th Cir. 2021).

enforcing the [vaccine] mandate in th[is] case[].” *Hobby Lobby*, 573 U.S. at 726-27. Here, Defendants cannot establish such a compelling interest for several reasons.

*First*, Defendants assert a purported compelling governmental interest in preventing the spread of disease to support mission accomplishment, including military readiness, unit cohesion, good order and discipline, and health and safety, at the individual, unit, and organizational levels. But *Hobby Lobby* rejected these “very broadly framed” interests, noting that RFRA “contemplates a ‘more focused’ inquiry.” *Id*. Indeed, “[b]y stating the public interests so generally, the government guarantee[d] that the mandate will flunk the test.” *Korte v. Sebelius*, 735 F.3d 654, 686 (7th Cir. 2013).

*Second*, “a law cannot be regarded as protecting an interest of the highest order” “when it leaves appreciable damage to that supposedly vital interest unprohibited.” *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 547 (citation omitted); *O Centro*, 546 U.S. at 433. Here, Defendants cannot claim an interest of the “highest order” when they grant administrative and medical exemptions, as noted above.

*Finally*, RFRA requires Defendants to identify a compelling need for enforcement against the "particular claimants" filing suit, not among a general population, such as all servicemembers. *Hobby Lobby*, 573 U.S. at 726-27. Defendants cannot make this showing. Defendants cannot show that enforcing the vaccine mandate against Appellant is "actually *necessary*" to achieve its aims. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (emphasis added).

This is particularly true because the Air Force has left wo much unexplained, such as why did it not factor in Appellant's natural immunity and specific health risk? Appellant is a healthy, young woman who has already recovered quickly from COVID-19. Why does Appellant specifically need to be vaccinated when Defendants have already reached a 98% vaccination rate? How well does vaccination prevent the transmission of COVID-19, especially in light of Defendants not mandating boosters? What is the likelihood of vaccinated servicemembers becoming infected with or spreading COVID-19 versus the likelihood of a young individual with natural immunity? Is Appellant's natural immunity equivalent or similar to any immunity provided by the vaccines? Why should Appellant be treated differently

39

from the government contractors who she works next to?  Why should Appellant's religious accommodation request be treated differently from medical and administrative exemptions?  Given the vaccination rate and composition of Appellants' specific unit, what risk does Appellant actually pose?

As noted by the district court in *U.S. Navy Seals 1-26*:

At least 99.4% of all active-duty Navy servicemembers have been vaccinated. . . . The remaining 0.6% is unlikely to undermine the Navy's efforts.  Today, Plaintiffs present a lower risk of infection and transmission than in the earlier days of the pandemic. Several Plaintiffs have tested positive for antibodies, showing the presence of natural immunity.    With a 99.4% vaccination rate, the Navy's herd immunity is at an all-time high.  COVID-19 treatments are becoming increasingly effective at reducing hospitalization and death.

*U.S. Navy Seals 1-26*, No. 4:21-cv-01236-O, 2022 U.S. Dist. LEXIS 2268 at *28- 29 (N.D. Tex. Jan. 3, 2022) (internal citations omitted).  The same is true here.  And lastly, why did Defendants disregard the finding of Appellants' commanders who both recommended granting her a religious exemption due to the specific and individualized findings of her request?

To be clear, Defendants' failure to "satisfy the Supreme Court's compelling interest standard[]" does not preclude this Court from "recogniz[ing] the importance of [the asserted] interests." *Hobby Lobby*

*Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013). The fact that an interest is not compelling does not make it unimportant or insignificant—it merely means that it does not justify overriding the congressional concern for religious liberty embodied in RFRA (or the constitutional concern embodied in the First Amendment, *see infra*). In other words, the government's interests underpinning the vaccine mandate may be variously described as legitimate, substantial, perhaps even important, but they do not rank as *compelling*, and *that makes all the difference*.

While the District Court in denying Appellants' motion for injunctive relief characterized the finding of a compelling interest here as "a close call," it ultimately erred in its conclusion. (JA 357, R-27, [Mem. Op. at 20]. This Court, reviewing the same issue *de novo*, should find Defendants have established no compelling interest here.

Defendants must also show that the vaccine mandate is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb- 1(b)(2). Under that "exceptionally demanding" test, *Hobby Lobby*, 573 U.S. at 728, "if there are other, reasonable ways to achieve those [interests] with a lesser burden on constitutionally

protected activity, [the government] may not choose the way of greater interference.  If it acts at all, it must choose less drastic means." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) (citation omitted).  A regulation is the least restrictive means only if "no alternative forms of regulation would [accomplish the compelling interest] without infringing [religious exercise] rights." *Sherbert*, 374 U.S. at 407.  This test is particularly demanding here, because "RFRA did more than merely restore the balancing test used in the *Sherbert* line of cases; it provided even broader protection for religious liberty than was available under those decisions." *Hobby Lobby*, 573 U.S. at 695 n.3 (citation omitted).

It bears emphasizing yet again that *Defendants* carry the burden of proof here. And Defendants cannot satisfy their burden through unsubstantiated statements and without an individualized assessment regard how all lesser restrictive alternatives are insufficient in Appellant's specific case. In the lower court, for example, Defendants never address how a multi-layered approach to risk mitigation would not serve its stated compelling interest.

Defendants must offer evidence—usually in the form of affidavits from government officials—explaining how the imposition of an

identified substantial burden furthers a compelling government interest and why it is the least restrictive means of doing so, with reference to the circumstances presented *by the individual case*. Indeed, such explanations must relate to the specific accommodation the plaintiff seeks; and where a plaintiff identifies acceptable less restrictive alternatives, *the government must demonstrate that it has considered and rejected the efficacy of those alternatives. See, e.g., Fisher v. Univ. of Tex.*, 570 U.S. 297, 311-15 (2013) (requiring a "serious, good faith consideration of workable [alternatives]") (citation omitted). In short, to prevail, Defendants must rely on *evidence* that the vaccine mandate is the <u>*only*</u> effective and feasible way to protect the health and safety of the military force.

Defendants cannot remotely meet this burden, nor have they done so here. And the fact that Defendants permit administrative and medical exemptions to the vaccine mandate is fatal to its compelling interest claim. *Church of Lukumi Babalu Aye*, 508 U.S. at 547 ("[A] law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.").

Appellant's unit, throughout the pandemic, has effectively instituted COVID-19 safety protocols, including quarantine protocol for those infected with the virus, mandatory reporting of symptoms[4] or exposure, mask wearing, environmental controls, and testing requirements. Defendants have not met their burden to explain in Appellant's specific case why these protocols or the multi-layering of these protocols, which are less restrictive alternatives to the vaccine mandate, were effective but are no longer effective as of May 13, 2022, especially in light of the pandemic becoming endemic and posing a less serious threat to public health. Defendants cannot meet their burden under RFRA. The vaccine mandate is unlawful. The injunction should issue.

**B.    The District Court Erred By Finding that Captain Creaghan Did Not Demonstrate a Likelihood of Success on her Free Exercise Claim.**

Fundamentally, the "exercise of religion" under the First Amendment embraces two concepts: the freedom to believe and the freedom to act. *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940); *see McDaniel v. Paty*, 435 U.S. 618, 626 (1978) ("The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding

religious beliefs as such."). Indeed, "[t]he principle that government may not enact laws that suppress religious belief or practice is . . . well understood." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 523.

As noted above, Appellant's religious objection to the vaccine mandate is religious exercise under RFRA and the First Amendment, and the direct punishment of Appellant for exercising her religion has and will continue to place a substantial burden on that religious exercise.

For similar reasons as to why the vaccine mandate violates RFRA, it also fails under the Free Exercise Clause. As noted, RFRA was a repudiation of the *Smith* decision. "*Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876. Consequently, any law that burdens religion and is *not* neutral and generally applicable is subject to strict scrutiny.

The Supreme Court's recent decision in *Fulton v. City of Philadelphia* provided much clarification as to which laws are generally applicable and which are not, and *Fulton* confirms that the vaccine mandate is not generally applicable, thereby triggering strict scrutiny.

45

As stated by the Court, "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct *by providing a mechanism for individualized exemptions*." *Fulton*, 141 S. Ct. at 1877 (internal quotations, punctuation, and citations omitted). applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*

As noted by the Court:

The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless *whether any exceptions have been given*, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude.

*Fulton*, 141 S. Ct. at 1879 (internal punction, quotations, and citation omitted) (emphasis added).

Here, there is a formal mechanism for granting exemptions to the vaccine mandate, and this mechanism invites the government to decide which reasons for not complying with the mandate are worthy of solicitude. Defendants permit administrative and medical exemptions to the vaccine mandate, thus rendering the mandate not generally applicable.

46

Additionally, medical exemptions are given *favored treatment* over religious exemptions, thus demonstrating that the mandate is also not neutral toward religion. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Church of Lukumi Babalu Aye*, 508 U.S. at 534; *see also id*. at 542-47 (invalidating city ordinances on free exercise grounds and concluding that the ordinances fail to prohibit nonreligious conduct that endangers the same governmental interests in a similar or greater degree than the religious conduct).

In *Church of the Lukumi Babalu Aye, Inc.*, the Supreme Court stated that "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous scrutiny." *Id*. at 546. In *Lukumi*, the Court reviewed several municipal ordinances regulating the slaughter of animals, one of which prescribed punishment for "whoever . . . unnecessarily . . . kills any animal"—a facially neutral ordinance. *Id*. at 537. The Court explained that this ordinance could not be applied to punish the ritual slaughter of animals by members of the Santeria religion when the ordinance was not applied to secular killings:

> [B]ecause [the ordinance] requires an evaluation of the
> particular justification for the killing, this ordinance

47

represents a system of individualized governmental assessment of the reasons for the relevant conduct. As we noted in *Smith*, in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of "religious hardship" without compelling reason. *Respondent's application of the ordinance's test of necessity devalues religious reasons for killing by judging them to be of lesser import than nonreligious reasons. Thus, religious practice is being singled out for discriminatory treatment.*

*Id.* at 537-38 (emphasis added) (quotations and citations omitted).

The lack of neutrality in the enforcement of the challenged mandate is demonstrated by at least two undisputed facts: (1) Defendants have granted administrative and medical exemptions and other religious exemptions but not Appellant's, and (2) Defendants will punish Appellant, and indeed has presented her will a Letter of Reprimand, but has not and will not punish other similarly situated individuals who have for example, a medical or administrative exemption or a different request for a religious accommodation.

Because the vaccine mandate is not a neutral law of general applicability it must survive strict scrutiny. As noted above, Defendants cannot meet their heavy burden in this case. The vaccine mandate violates the Free Exercise Clause of the First Amendment.

48

**C.    The District Court Erred By Not Finding a Likelihood of Success in Captain Creaghan's Equal Protection Claim.**

The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). Consequently, case law interpreting the Equal Protection Clause of the Fourteenth Amendment is applicable when reviewing an equal protection claim arising under the Fifth Amendment, as in this case.[5]

It is axiomatic that the constitutional guarantee of equal protection embodies the principle that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Skinner v. Okla.*, 316 U.S. 535, 541 (1942) ("The guaranty of equal protection of the laws is a pledge of the protection of equal laws.") (internal quotations and citation omitted). And this constitutional guarantee applies to administrative as well as legislative acts. *Raymond v. Chi. Union Traction Co.*, 207 U.S. 20, 35-36 (1907).

The Supreme Court's equal protection jurisprudence has typically been concerned with governmental classifications that "affect some

groups of citizens differently than others." *McGowan v. Md.*, 366 U.S. 420, 425 (1961); *Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("'Equal Protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.").

Moreover, as noted by the Sixth Circuit sitting *en banc*, when the government treats an individual disparately "as compared to similarly situated persons and that such disparate treatment . . . *burdens a fundamental right*, targets a suspect class, or has no rational basis," such treatment violates the equal protection guarantee. *Bible Believers v. Wayne Cnty.,* 805 F.3d 228, 256 (6th Cir. 2015) (*en banc*) (internal quotations and citation omitted) (emphasis added).

"In determining whether individuals are 'similarly situated,' *a court should not demand exact correlation*, but should instead seek relevant similarity." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (internal quotation marks omitted) (emphasis added). In this case, similarly situated servicemembers requesting an exemption are not treated the same, and the distinction is based on the nature of the servicemember's request for an exemption: it is medical, administrative or religious. The process specifically disfavors granting

*religious* objections. As noted above, Defendants have granted other exemptions to the mandate with very little process or concern. If Appellant had asserted a valid medical exemption request or, as she did previously, asserted a valid request for an administrative exemption, she would have been granted an exemption without further question. Indeed administrative exemption are granted almost automatically.

This disparate treatment burdens the fundamental right to religious exercise, thereby requiring Defendants to satisfy strict scrutiny, which they cannot as argued above. The vaccine mandate violates the equal protection guarantee of the Fifth Amendment.

### D.    Without Injunctive Relief, Captain Creaghan Will Undergo Irreparable Harm.

Without injunctive relief, Appellant will be irreparably harmed. Defendants' vaccine mandate imposes a substantial burden on Appellant's religious exercise—a fundamental right protected by RFRA and the First Amendment.

It is well established in constitutional jurisprudence that "[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373 (emphasis added). And this injury is sufficient to justify the requested

injunctive relief. *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*); *see also Navy Seal 1 v. Austin*, No. 8:21-cv-2429-SDM- TGW, 2022 U.S. Dist. LEXIS 31640 at \*63 (M.D. Fla. Feb. 18, 2022) ("Requiring a service member either to follow a direct order contrary to a sincerely held religious belief or to face immediate processing for separation or other punishment undoubtedly causes irreparable harm."); *Air Force Officer v. Austin*, 2022 U.S. Dist. LEXIS 26660, at \*32-33 ("Plaintiff has suffered an irreparable injury. [T]he choice to adhere to her religious beliefs or modify her behavior to violate those beliefs suffices to trigger constitutional protection. Thus, plaintiff has satisfied the second element to obtain a preliminary injunction.") (internal punction, quotations, and citations omitted); *U.S. Navy Seals 1-26*, 2022 U.S. Dist. LEXIS 2268, at \*35-36 ("The crisis of conscience imposed by the [vaccine] mandate is itself an irreparable harm. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' *Elrod*, 427 U.S. at 373 (plurality opinion). The same is true of RFRA

Thus, any losses the Plaintiffs have suffered in connection with their religious accommodation requests sufficiently demonstrate irreparable injury. [T]he principle the Supreme Court articulated in *Elrod v. Burns* applies broadly, and the Fifth Circuit has acknowledged that any loss of First Amendment freedom satisfies the irreparable injury requirement, even in the national security context. Thus, the second requirement for injunctive relief has been satisfied.") (internal quotations and citations omitted)).

And as stated by this Court,

> "suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury *other than the threatened constitutional deprivation itself*." *Davis v. District of Columbia*, 158 F.3d 1342, 1346, 332 U.S. App.D.C. 436 (D.C. Cir. 1998). Thus, "[a]lthough a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, *a prospective violation of a constitutional right constitutes irreparable injury for these purposes*. *Id.* (internal citation omitted).

> *Gordon*, 721 F.3d at 653 (emphasis added).

Accordingly, the irreparable harm to Appellant is the *depravation* of her *right to religious exercise* protected by federal statutory and constitutional law. It is not simply the loss of pay or benefits—these losses only constitute part of the *burden* upon Appellant's religious exercise, thereby *triggering* the constitutional violation. Here, Appellant

53

has punished by receiving a Letter of Reprimand and is now facing adverse disciplinary proceedings for exercising her right to religious exercise.[6]  She faces the threat of receiving an adverse performance evaluation for exercising his right to religious exercise and a panolopy of adverse consequences at the Defendants' fingertips.  Appellant faces the threat of recoupment and even separation.  These are all *substantial burdens* on Appellant's religious exercise, but the deprivation of her right to religious exercise caused by these burdens "*constitutes* [the] *irreparable injury*" warranting the requested injunction.

Irreparable harm *is caused by the substantial burden placed on Appellant's religious exercise* under the First Amendment *and* RFRA. *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[A]lthough the plaintiff s free exercise claim is statutory rather than

---

[6] *See also Foretich v. United States*, 351 F.3d 1198, 1214 (D.C. Cir. 2003) (acknowledging "reputational injury that derives directly from government action," noting that "[r]edress is possible in such a case because the damage to reputation is caused by the challenged action," and concluding that the equitable relief of a "declaratory judgment that the government's actions were unlawful will consequently provide meaningful relief").

constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily.    The District Court is wrong in finding an absence of irreparable harm as a matter of law.

### E.    The Balance of Harm Tips in Favor of Granting Captain Creaghan Injunctive Relief.

The likelihood of harm to Appellant is substantial because she seeks to protect a fundamental liberty interest—the right to religious exercise. *See supra.* On the other hand, if Defendants are restrained from enforcing the vaccine mandate against Appellant, they will suffer no harm because the exercise of a protected right can never harm any of Defendants' or others' legitimate interests. *Priests for Life v. U.S. Dep't of Health and Human Servs.*, 772 F.3d 229, 276 (2014) (addressing the harm of leaving an illegal mandate in place with the expectation that it will violate federal civil rights the federal government is "obligat[ed]" to "alleviate any burden on religious liberty"); *see also Hobby Lobby*, 573 U.S. at 751-52 & n.14; ; *Pursuing Am.'s Greatness,* 831 F.3d at 511 (stating that "in this case, the FEC's harm and the public interest are one and the same, because the government's interest *is* the public interest" and emphasizing that "*there is always a strong public interest in the*

55

*exercise of* [*First Amendment*] *rights otherwise abridged by an unconstitutional regulation* and, without a preliminary injunction, PAG is unable to exercise those rights during this election cycle") (emphasis added).

On the other hand, if Defendants are restrained from enforcing the vaccine mandate against Appellant, they will simply be in the same position that they have been in from November 2, 2021 to May 13, 2022 when they voluntarily granted Appellant a temporary exemption. Appellant has had COVID-19 and recovered with no issues and has the antibodies to COVID-19.   And Defendants have already reached a vaccination rate over 98%.

There are numerous less restrictive means to promote force protection short of mandating that Appellant get vaccinated in violation of her sincerely held religious beliefs. And Appellants' commander recognized that these lesser restrictive alternatives were sufficient to address Defendants' purported compelling interest in mandating Appellant undergo vaccination against her sincerely held religious beliefs.  (JA 301-03, R-22 at Ex. 12 [Resp. to Mot. for Prelim. Inj.])

And by granting administrative and medical exemptions to others, the exceptions to the vaccine mandate should lead the Court to conclude that Defendants' actions do not promote a governmental interest "of the highest order." *Church of Lukumi Babalu Aye*, 508 U.S. at 547.

### F. Granting an Injunction to Protect Captain Creaghan's Sincerely Held Religious Exercise Serves the Public Interest.

The impact of the preliminary injunction on the public interest turns in large part on whether the vaccine mandate violates Appellant's right to free exercise. As this Court observed as a matter of law, "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653; *see also Priests for Life*, 772 F.3d at 276; *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties").

As set forth above, the vaccine mandate violates Appellant's religious exercise. Therefore, it is in the public interest to issue the injunction. Additionally, without the injunction, Defendants (and our nation) will be losing a well-trained, brilliant Space Force Captain and during a time when the world is experiencing formidable conflicts such as Russia's invasion of Ukraine, China's aggressive actions toward Taiwan, and many other threats.

Considering Captain Creaghan's commanders observed that granting her a religious exemption would not harm unit operations and that many individuals in her unit do not even fall under Defendants' mandate, the public is best served by accommodating Appellant's reasonable request. As one court aptly concluded, the public is best served by having "a military force strong enough to respect and protect its service members' constitutional and statutory religious rights." *Air*

*Force Officer*, 2022 U.S. Dist. LEXIS 26660, at *35.[7]

## CONCLUSION

The Court should reverse the District Court and remand the case with instructions to grant Appellant's motion and enter a preliminary injunction enjoining Defendants from (1) enforcing against Appellant any order or regulation requiring COVID-19 vaccination that violates her sincerely held religious beliefs and (2) from instituting or enforcing any adverse or retaliatory action against Appellant as a result of, arising from, or in conjunction with Appellant's sincere religious objection to Defendants' COVID-19 vaccination mandate, her request for a religious exemption from the vaccine mandate, or pursuing this action or any other action for relief under RFRA or the First and Fifth Amendments.

Date: August 22, 2022                    Respectfully submitted,

                                         THOMAS MORE LAW CENTER

                                         /s/ Richard Thompson

---

[7] To the extent that the District Court found that "military and scientific justiciability concerns remain in this case," this case is, as a matter of law, is justiciable. (JA 351, R-27 [Mem. Op. at 14]). Congress, per the language of RFRA, intended for the statute to apply in full force without undue deference to the military. *See Singh v. Carter*, 168 F. Supp. 3d 216, 226 (D.D.C. 2016) ("Congress nowhere inserted any exception for the U.S. Armed Forces from RFRA's application"); *see also Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012).

Richard Thompson

*Erin Elizabeth Mersino*
Erin Elizabeth Mersino
24 Frank Lloyd Wright Drive, J-3200
Ann Arbor, MI 48106
Ph: (734) 826-2001
Email: emersino@thomasmore.org

**CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Fed. R. App. P. 32(a)(7), the foregoing Brief is proportionally spaced, has a typeface of 14 points Century Schoolbook, and contains 11,525 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii).

Date: August 22, 2022                    THOMAS MORE LAW CENTER

_/s/ Erin Elizabeth Mersino_
Erin Elizabeth Mersino

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that all of the participants in this case are registered CM/ECF users.

Date: August 22, 2022              Respectfully submitted,

                                  THOMAS MORE LAW CENTER

                                  /s/ *Erin Elizabeth Mersino*
                                  Erin Elizabeth Mersino